THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF TENNESSEE

---

KENNETH E. SAVAGE, JR.,

    PLAINTIFF,

VS.               NO. 2:14-cv-02057-STA-dkv


FEDERAL EXPRESS CORPORATION,
D/B/A FEDEX EXPRESS, FEDEX
CORPORATION EMPLOYEES' PENSION
PLAN, FEDEX CORPORATION RETIREMENT
SAVINGS PLAN,

    DEFENDANTS.

---

VIDEO DEPOSITION

OF

JOHN MAXWELL

JULY 28, 2015

TAMMY WENDEL, LCR, CCR
4735 Beech Bluff Road
Beech Bluff, Tennessee 38313
(C) 731-935-9960   (O) 731-935-0094
wendel.reporting@gmail.com

Exhibit G

2

<pre>
 1              The video deposition of JOHN MAXWELL

 2      is taken on this, the 28th day of July, 2015,

 3      on behalf of the Plaintiff, pursuant to notice

 4      and consent of counsel, beginning at

 5      approximately 12:05 p.m. at FedEx World

 6      Headquarters, 3620 Hacks Cross Road, Building

 7      B, Memphis, Tennessee.

 8              This video deposition is taken

 9      pursuant to the terms and provisions of the

10      Tennessee Rules of Civil Procedure.

11              All forms and formalities, including

12      the signature of the witness, are waived, and

13      objections alone as to matters of competency,

14      irrelevancy and immateriality of the testimony

15      are reserved to be presented and disposed of at

16      or before the hearing.

17

18

19

20

21

22

23

24
</pre>

```
1                    A P P E A R A N C E S

2

3      ON BEHALF OF THE PLAINTIFF:

4            JOSEPH NAPILTONIA
             ATTORNEY AT LAW
5            22515 BANISTER
             SAN ANTONIO, TEXAS  78259
6            615.336.6882

7

8      ON BEHALF OF THE DEFENDANTS:

9            TERRENCE O. REED
             FEDEX EXPRESS
10           SENIOR COUNSEL-EMPLOYMENT LITIGATION
             3620 HACKS CROSS ROAD
11           BUILDING B, SECOND FLOOR
             MEMPHIS, TENNESSEE  38125
12           901.434.8603

13

14

15

16

17

18

19

20

21

22

23

24
```

```
1                    I N D E X

2

3   Direct Examination
      By Mr. Napiltonia..........................6

4   Cross Examination
      By Mr. Reed...............................85

5

6

7

8

9                   E X H I B I T S

10

11                                          PAGE

12  Exhibit 1  June 16, 2006 Letter to
               Captain David Webb From
13             John D. Maxwell...................17

14  Exhibit 2  Settlement Agreement...............70

15  Exhibit 3  March 13, 2013 Letter To
               U.S. Department of Labor From
16             Arris Reddick Murphy..............75

17

18

19

20

21                                          PAGE

22
    COURT REPORTER'S CERTIFICATE.................92
23

24
```

1    A.  But I'm familiar with the -- how it
2  works generally.
3    Q.  Okay, the process.  Okay.  So, is it
4  fair to say you handled more transactional work
5  on the corporate side?
6    A.  Not so much.  I mean, we have a
7  Business Transactions Group that does most of
8  that stuff.  I mean, I think what I do is -- 90
9  percent of my time is spent working with pilots
10  in all manner of their employment here.  So, I
11  mean, Labor Relations is the focus, but my
12  group and I, we negotiate the labor contracts
13  with the pilots, we give the corporation legal
14  advice as to how to apply those agreements.  We
15  oversee all that.  We handle the Grievance and
16  Discipline Administration process, those kind
17  of matters, so not really transactional in a
18  business transaction sense, but just labor law
19  work.
20    Q.  Okay.  I understand.  Nevertheless,
21  you understand you're here today under oath no
22  different than if we were in court in front of
23  a judge?
24    A.  Sure.  Of course.

9

1       Q.   And -- and how many years do you have

2  with FedEx?

3       A.   I'll finish twenty-two in October.

4       Q.   That's a long time.

5       A.   That's a long time.

6       Q.   All right.  You touched on it a

7  little bit earlier, but if you could just

8  expand on what roles you've had at FedEx and

9  just starting from, you know, when you began

10  twenty-two years ago --

11       A.   Sure.

12       Q.   -- and bring me forward.  You don't

13  have to go into each, you know, job

14  description, but if you could just state what

15  that job was.

16       A.   Sure.  I -- I started in an entry

17  level position called Staff Attorney

18  something-or-other.  I can't remember what the

19  exact title was.  Progressed through the career

20  progression.  There's sort of a career

21  progression sequence that you go through.  Was

22  made Managing Attorney in the middle to late

23  '90s, then Managing Director in 2001 or 2002,

24  and then Vice-President in 2010, and so, in

10

1   terms of duties, I mean, there's an --

2   obviously, there's an ascending level of

3   responsibility and span that -- you know, that

4   occurs during that period of time.

5       Q.   Let's start with 2010 as the

6   Vice-President.  Is that the position you hold

7   today?

8       A.   That is the position I hold today.

9       Q.   Okay.

10      A.   And, so, really, I -- I mean -- I --

11  I think I -- I tried to describe the duties

12  that I have in that position.  There's -- I --

13  I -- there's a couple that I missed.  Like I

14  said, 90 percent of the work has to do with

15  dealing with the pilots.  There's 10 percent --

16  and here's what my group does underneath all

17  that.  Okay?  There's -- most of the people are

18  engaged in the matters that I just talked

19  about:  Negotiating pilot contracts, giving

20  legal advice to the company on how to apply

21  those contracts, managing and -- and trying the

22  cases that occur in the -- the -- both the

23  grievance side of the arbitration process, as

24  well as the Contract Admin -- contract side.

1    There's a subset of my group that is

2    responsible for delivering pilot healthcare

3    benefits and liaising with -- with the -- the

4    retirement function, which is not in my shop,

5    but we liaise with those people.   Then there's

6    a separate group which focuses on -- which is

7    smaller and which focuses on employee and

8    management training and trying to ensure that

9    direct relationship with FedEx is the best

10   option for the employee, so that's sort of the

11   umbrella of -- of what -- what my group does

12   and functionally what I do, as well.

13          Q.   Okay.   Let me ask you.   Do you know

14   how many pilots FedEx has in the company

15   worldwide?

16          A.   Yeah.   About 4,200.

17          Q.   All right.   And how about

18   domestically in the United States?

19          A.   The -- well, they're all domestically

20   in the United States, except for we have a base

21   in Hong Kong and a base in Cologne.   I don't

22   know the exact number.   There are about --

23   let's -- let's call it 110 or 115 pilots

24   average in both those bases, so take 250 off

```
 1   we build the pilot work rules, and I'm
 2   generally aware of it just because, you know, I
 3   attend -- I have to get CLEs like -- like
 4   everybody else does, and so, you know, I've
 5   tried to keep myself abreast of basic
 6   employment law issues, although employment law
 7   is not -- is not the focus of me or my group.
 8   So, I'm aware of USERRA because of that, and
 9   I'm also aware of it because, you know, there
10   are various parts of the Collective Bargaining
11   Agreement that we have to make sure line up, in
12   particular, the parts that have to do with
13   leaves of absence for military service and the
14   calculation of probationary periods while
15   pilots are on military service and -- and
16   also -- retirement benefits also are impacted.
17        Q.   Okay.  Did you have occasion, while
18   working at FedEx in any role, to deal with the
19   issue of how pilots' military service affects
20   their retirement plan contributions?
21        A.   Yes.
22        Q.   If you could just tell me in general
23   terms, when did you start to address that
24   issue?
```

1     A.   Well, they -- I mean, I think the

2     biggest sort of occurrence of that -- I mean, I

3     think it's implicit in -- it's implicit in how

4     the contract works from the beginning, but, I

5     mean, I think the biggest sort of concentration

6     of that sort of discussion was in the 2006

7     timeframe when there was some debate about

8     whether the company was applying a particular

9     portion of the pilots' retirement benefit,

10    called the B-Plan, which is a special Defined

11    Contribution Plan that only the pilots have,

12    whether we were properly calculating retirement

13    benefits in the case of short-term military

14    leaves, and there was -- there were some

15    differences of opinion about that, and after

16    that, the company changed the way that it

17    calculated the DC -- you know, the DC benefits

18    based on short-term military leaves.

19         Q.   And what -- what does the term "DC"

20    refer to?

21         A.   Defined contribution.

22         Q.   Okay.  You're talking about

23    retirement --

24         A.   I am.

1        Q.   All right.   Let me ask you.   You --

2    you testified earlier that your work group does

3    not deal with the employment law side of FedEx;

4    is that correct?

5        A.   Not directly.

6        Q.   Okay.

7        A.   I mean, that's not our primary job

8    function.   I mean, you know, we try to --

9        Q.   You cross over?

10       A.   -- be generally aware and -- and

11   we -- you know, we try to be -- when we spot an

12   issue, then we -- we seek counsel from the

13   company's Employment Law Group if we need it,

14   which, you know, sometimes we do.

15       Q.   So, is it fair to say that at least

16   your group collaborates with FedEx's Employment

17   Law Group?

18       A.   Yes.

19       Q.   Is there -- so there's nothing that

20   would prohibit, for example, you, as an

21   attorney working in a different group, to pick

22   up the phone and call FedEx's Employment Law

23   Group and say, "Hey, I have a question about

24   this" and --

```
 1        A.   No.

 2        Q.   -- they would answer it?

 3        A.   They would.

 4        Q.   All right.  Let me hand you a

 5   document which I'd like to mark as Exhibit 1 to

 6   the deposition.

 7             (WHEREUPON, EXHIBIT NO. 1 WAS MARKED

 8        TO THE TESTIMONY OF THE WITNESS AND IS

 9        ATTACHED HERETO.)

10             (DOCUMENT PASSED TO THE WITNESS.)

11        Q.   Sir, can you identify that document

12   for the record?

13        A.   Sure.  This is -- this is a letter I

14   wrote to Captain Webb, who was, at the time,

15   the -- ALPA's MEC Chairman, describing, really,

16   the matter that I just mentioned a couple of

17   questions ago.

18        Q.   Okay.  I'd like you to turn to Page

19   2.

20        A.   Uh-huh (affirmative response).

21        Q.   Is that your signature at the bottom,

22   sir?

23        A.   It is.

24        Q.   All right.  And if you could just
```

1      Q.   Would this legal group be the -- the

2    group within FedEx that provided guidance to

3    the company as to what the company's

4    obligations were under USERRA regarding

5    retirement contributions?

6      A.   They are -- they're essentially --

7    their focus is ERISA, and so to the extent

8    that, you know, applying ERISA correctly

9    requires some understanding of USERRA, then,

10   yes, I think legal advice would come from

11   there.  The other source that it would

12   primarily come from is the Employment Law Group

13   here at Express, so I think those two groups

14   would collaborate to provide the bulk of legal

15   advice and -- and I, our group, would then

16   provide the legal advice of how to integrate

17   that all in the contract and deal with the

18   pilots' Union about it.

19     Q.   Okay.  Were -- this legal group that

20   deals with retirement benefits and the

21   Employment Law Group, were they around in 2006?

22     A.   They were.

23     Q.   It also states in Paragraph Number 2:

24   "...the company understands USERRA to require

1    that B-Plan contributions be made for pilots

2    who return to work following periods of

3    qualifying military leave even though they are

4    not paid while taking that leave." Do you see

5    that, sir?

6           A.   I do.

7           Q.   To the best of your recollection,

8    when did FedEx come to know this?

9           A.   I think it happened during this

10   period of time. Well, let me back up and say

11   you kind of have to -- well, I think the

12   company always knew that -- that B-Plan

13   contributions needed to be -- that B-Plan

14   contributions needed to be made during some

15   periods of military service. Okay? So I think

16   we always did that when it -- we split the

17   world, for military service and pilots, into

18   long-term military leaves and short-term

19   military leaves, so I think there will always

20   be plan contributions made whenever the

21   underlying leave was a long-term military

22   leave. In the short-term military leave,

23   here's -- here's how -- here's how it worked,

24   and you kind of have to understand, a little

1    bit anyway, about how pilot schedules are

2    built, because they're different from everybody

3    else's.  I mean, just to use a simple example,

4    a pilot's schedule for the month is called a

5    "line."  It's his line of time, and so in the

6    short-term military leave situation -- let me

7    back up.  In a long-term military leave

8    situation, the employee is shown in the system

9    as being inactive.  He's not at the company.

10   He's off doing something else for some longer

11   period of time.  In 2006, it was, I think, 15

12   days.  It's since made its way up to 31 days.

13   Whatever the line of delineation is, there are

14   short-term leaves and long-term leaves.

15          In a short-term leave, the pilot is

16   active in the system and show -- and so the

17   system doesn't show any break in service at

18   all, and how -- how you handle military leaves,

19   then -- I mean, an essential requirement of

20   which is that the pilot's allowed not to do the

21   work for FedEx while he's doing his military

22   service is that any conflicting activities on a

23   pilot's line are -- are dropped off that line,

24   the pay goes away with the -- with the

24

1   requirement to work, and then he flies whatever

2   remaining portion of that line is left.  The --

3   the -- the nuance that was being studied at

4   that point in time was -- had to do with how

5   and when pilots get B-Plan contributions for

6   short-term -- for short-term leaves.

7          There's one more thing you need to

8   know in order to understand what was going on,

9   and that is that all the time there is a -- I

10  mean, today, if we sampled it today and looked

11  out there, we would find what we call "open

12  time," and open time is trips that need to be

13  flown, and "trip" is just the stringing

14  together of flights for pilots.  Okay?  There

15  are trips that need to be flown that are not

16  currently assigned to any pilot and, hence,

17  those trips are open.  Although we have lots of

18  qualified pilots to fly those open trips,

19  pilots don't have a per se right to go pick

20  them up and fly them even if their schedule

21  would -- would support it, and there are lots

22  of rules that say how you generate an

23  entitlement to pick that trip up, but one of

24  the major ways is that you have credit in what

25

we call your "makeup bank," so -- and here's
the reason that that is important for military
leave.  When a military leave in a short-term
situation conflicts with a trip, then that --
the credit hours for that trip drop into the
pilot's makeup bank, and that gives the pilot
the right to fly back those hours at some later
time whenever it suits him to do so.  Okay.
So, a normal line for a pilot might be 72
credit hours of work.  Let's say a
42-credit-hour trip conflicts with military
leave.  That 42 credit hours would then be
credited to his makeup bank, and he could
choose to fly that back as soon as he gets back
from military leave or at any point in the
future.  And the way the system worked before
we did this change in 2006 is that there wasn't
any B-Plan contribution made when the trip
dropped out.  We waited for the pilot to fly
that back, and when he flew that back, then he
got a B-Plan contribution at that point in
time.  The work was done, the pay was earned,
and then the B-Plan contribution was made, and
I think that there was a debate, from a legal

1    standpoint, as to whether that was an

2    appropriate application of USERRA.  At the end

3    of the day, what the company decided to do was

4    say -- and they were concerned about the fact

5    that that meant that we were not making B-Plan

6    contributions within 90 days after the

7    serviceman's return because it really depended

8    on when he flew the hours back, not on how many

9    days had elapsed since the conclusion of the

10   leave, so the company decided that the better

11   application of USERRA was to make the B-Plan

12   contribution -- on my example, the 42-hour

13   trip -- shortly after the trip was dropped,

14   certainly within 90 days, regardless of when,

15   if ever, the pilot ever flew the trip back, so

16   that's the change that was made in 2006 when it

17   comes to -- and, again, it was about short-term

18   military leaves and the B-Plan.

19        Q.   Okay.  Thank you for that --

20        A.   Sorry.

21        Q.   -- very good explanation.  No, I

22   appreciate it.  Let me ask you.  When did --

23   how many people were involved in -- you

24   testified earlier that this nuanced -- this

48

1      Q.   When you were involved with this

2   issue in regard to the pilots' B-Plan funds

3   and -- and the fact that some of the

4   calculation in regard to short-term military

5   leave and their military service, this issue

6   with the calculations --

7      A.   Uh-huh (affirmative response).

8      Q.   -- were you involved in that?

9      A.   Yes.

10     Q.   You testified earlier there were some

11   significant resources devoted to it, correct?

12     A.   Yes.

13     Q.   Okay.  Did you have any

14   communications with the FedEx -- you know, the

15   Employment Division or the Benefits Division or

16   anybody?  Did you raise the issue that maybe

17   this affected other employees who also served

18   in the National Guard and Reserves?

19     A.   No, because, I mean, this is pretty

20   pilot-specific.  I mean, it has to do with

21   trips dropping off a pilot's line and whether

22   they fly those trips back and when the credit

23   ought to happen and so forth, and so, in my

24   view, that's just -- that's a -- that's a

1   specific sort of employment situation and

2   applies to crew members, so, it -- I wouldn't

3   have seen -- I don't see an analog I guess is

4   what I'm saying.

5        Q.  You don't see that there could be a

6   connection between -- if I understand you

7   correctly, between the fact that some of FedEx

8   pilots who served in the military, retirement

9   accounts were not properly credited when they

10  performed miliary service, and other employees,

11  for example, mechanics' retirement accounts who

12  also served in the military?  You -- you -- you

13  didn't see a connection?

14       A.  I don't -- I -- I didn't and I don't

15  because it's not my understanding of how -- I

16  mean, it seems like that's a specific thing to

17  pilot work, that there are trips that drop out

18  in conflict and that can be flown back later or

19  not.

20       Q.  And were there any discussions with

21  anybody at FedEx, with the exception of FedEx's

22  attorneys, in regard to whether or not

23  employees at the company who all -- who served

24  in the National Guard and Reserves, whether

1    their retirement benefits were being properly

2    calculated?

3          A.   Not that I recall, and I was focusing

4    on pilots.

5          Q.   I understand that.  I'm just --

6    I'm -- I'm just asking you, quite pointedly,

7    whether or not you recall any discussions

8    across the board that possibly this could

9    affect other service members?

10          A.   I do not.

11          Q.   As you sit here today, do you know

12    whether or not other employees who served in

13    the National Guard and Reserves, whether or not

14    their retirement accounts were affected?

15          A.   I don't.

16          Q.   Let me ask you.  In regard to the

17    pilots' Traditional Benefit Plan --

18          A.   Uh-huh (affirmative response).

19          Q.   -- do you know if any of -- if there

20    was any discussion, whether or not that was

21    affected by military service?  So the pilots

22    have different plans you testified --

23          A.   Yes.  Yes.

24          Q.   -- earlier?  One is the B-Plan, which

58

1            FedEx has, he can't testify to that.

2            Proceed with your answer.

3            A.   Would you mind saying it again?

4            Q.   Sure.   Sure.   What I'm asking you is,

5     during the time that -- I mean, you testified

6     earlier that you -- that you and -- strike

7     that -- that FedEx had devoted significant

8     resources to looking at this issue in regard to

9     the B-Plan fund and service members who -- who

10    are pilots at FedEx and their retirement

11    accounts?

12           A.   Yes.

13           Q.   Okay.   And you also testified earlier

14    that there was some discussion in regard to the

15    Traditional Benefit Plan and how it may have

16    affected pilots' retirement benefits, correct?

17           A.   Yes.

18           Q.   Okay.   There were discussions about

19    it?

20           A.   Yes.

21           Q.   And there were discussions with the

22    Union about that?

23           A.   Those are the discussions that I'm

24    recalling is the ones with the Union.

Q.  Okay.

A.  Yeah.

Q.  All right.  Can you explain -- since they were with the Union --

A.  Uh-huh (affirmative response).

Q.  -- what was the substance of those discussions in regard to the Traditional Benefit Plan and whether or not it affected, you know, pilots who served in the National Guard and Reserves?

A.  Yes.  It -- it could affect both B-Plan contributions and potentially the Traditional Pension Benefit, but, honestly, unlikely to affect the Traditional Pension Benefit.  You'd still have to run the -- you'd still have to gather the data to make sure, but the -- let me do an example to sort of illustrate what the issue was.  Let's say a military pilot is out for four years, and during those -- during that four-year period of time, it's an active period of time in terms of the company's posting new positions and training and so forth, so during that period of time, the pilot would -- by "posting," I mean

1    the company puts out a bid for a certain number

2    of new positions, and pilots bid on those

3    postings by their seniority.  Okay?  So, if

4    you're out during -- for four years and there's

5    a significant amount of -- number of new

6    positions that are being created or -- or are

7    available for whatever reason, then what could

8    happen is -- the -- the way we worked the

9    system was when the pilot came back from

10   military leave, he got a chance to look at all

11   the postings that happened during his absence

12   and he got to choose the crew position that his

13   seniority allowed him to hold, so -- well,

14   that's pretty much it.  Whatever seniority

15   he -- that -- that -- that he could hold, he

16   was assigned to train for that crew position,

17   and when he completed training for that crew

18   position, then that would be -- his pay rate

19   going forward would be that, but the pay rate

20   that was applicable to his period of military

21   absence would be the one he held when he went

22   out, so the Union said that while the hourly

23   rate shouldn't just apply from when he got back

24   from military service and going forward, but it

1    should reach back into the period of military

2    service for some period of time.  There was,

3    inside that period, then, a difference of --

4    well, there were some who argued that if the

5    pilot had had multiple opportunities to move,

6    then there might -- then they argued that there

7    should be multiple hourly-rate changes.  I

8    mean, I think the company's position was that

9    there are a lot of things that go into

10   determining whether a pilot actually achieves a

11   new crew position.  One of them is, "Do you

12   have the seniority to hold it?"  That's

13   objective, but there -- there are a couple of

14   subjective ones, as well, the biggest one being

15   whether the pilot would actually have bid for

16   that crew position.  And pilots very, very

17   often, I would say more often than not, do not

18   bid for a promotional crew position when

19   they're first able to hold it.  They often wait

20   until they have a certain level of seniority,

21   because if they bid it when they can very first

22   hold it, they have very little control over

23   what their schedule is, so many choose to wait

24   until they're at whatever level of seniority in

```
1    that crew position that they -- that they want

2    in order to manage their own schedules.  And so

3    our view was, there's no way to tell what a

4    pilot would have done in the middle of his --

5    you know, at the period of time that he

6    happened to be serving military, whether he

7    would have bid for it or not.  And then the

8    third element was, you know, there's always a

9    question of whether you can bid for a new crew

10   position, but not everybody passes training, so

11   our view was that the crew status change wasn't

12   reasonably certain, which I understood to be a

13   term of art in USERRA, and as a result of that,

14   that it -- that period of military service

15   would have applied to at the hourly rate that

16   he had when he went out and that the new hourly

17   rate would be applied, like it does for

18   everybody else, when he came back, passed

19   training, went forward.  As I said, the Union

20   thought that there should be some reaching back

21   of that, and, as part of an overall settlement

22   of a bunch of issues, we agreed to look back

23   to -- to one crew status change.  Basically, we

24   said, "If you come back and you choose a new
```

```
 1    crew status, we will -- and you pass training

 2    for that crew status, we will look back into

 3    your military leave period and -- and determine

 4    what is the first point at which you could have

 5    held that crew status, add the training

 6    period," and then that's how we would apply the

 7    hourly rate.  So the hourly rate -- the hourly

 8    upgrade -- it's not always an upgrade, but

 9    usually it is -- would apply from that point

10    forward and the rest of the military service

11    period would have the hourly rate that was

12    applicable to the pilot when he went out, so

13    that is part of the imputed earnings

14    calculation, which would have an impact on the

15    B-Plan for sure, and it could have an impact on

16    the pension plan -- on the Traditional Pension

17    Benefit, although that really depends more

18    on --

19         Q.   The factors you just -- the factors

20    that you just testified to, correct, in regard

21    to whether or not it'd be reasonably certain

22    and those sorts of things?

23         A.   I'm sorry?

24         Q.   Because I'm asking you specifically
```

1    the Union and it would have been available for

2    any line pilot to -- to look at.

3         Q.   Okay.  Can you spell your

4    supervisor's name for the record?

5         A.   Yeah.   M-A-L-I-N-I-A-K.

6         Q.   These contracts with the pilots'

7    Union you have referred to, are they business

8    records?

9         A.   The Collective Bargaining Agreements?

10        Q.   Yes, sir.

11        A.   I don't know what you mean by

12   "business records."  I mean, they're --

13        Q.   Are they kept in the normal course of

14   business at FedEx?

15        A.   Yes.

16        Q.   All right.  Is there a custodian of

17   records that keeps those documents?

18        A.   Well, I mean, again, a term of art.

19   I'm not sure that I'm -- we have copies of the

20   Collective Bargaining Agreement.

21        Q.   Okay.  In your division?

22        A.   Yes.

23        Q.   All right.

24        A.   And we distribute copies of the

1  use the term "pilot's Union," will that be

2  okay?

3          A.   That will be fine.

4          Q.   You understand what I mean?

5          A.   I do.

6          Q.   Okay.  Sir, have you had a chance to

7  review this document?

8          A.   I have.

9          Q.   Does this accurately reflect the

10  document that was entered into by FedEx and the

11  pilots' Union?

12          A.   It does.

13          Q.   All right.  Just generally speaking,

14  what's this Settlement Agreement about?

15          A.   It has to do with how to handle crew

16  status changes in the context of calculating

17  imputed earnings when there's a military leave

18  that occurs.

19          Q.   Okay.  And let -- let me ask you a

20  question.  In Paragraph 3 on the second page,

21  do you see where it says "A-L-P-A Release of

22  Claims?

23          A.   I do.

24          Q.   What is a Release of Claims?

1       A.   Yes.

2       Q.   Was Ms. Murphy around and involved in

3   any of the discussions in 2006?

4       A.   I don't believe so.

5       Q.   How about in 2008 when the Settlement

6   Agreement was signed?

7       A.   I don't recall, but the discussions I

8   had that I recall were with Ms. Wells.

9       Q.   Okay.  Let me ask you.  Why did it

10  take two years and six months or more for FedEx

11  to enter into an agreement formally with the

12  pilots' Union?

13      A.   Which agreement are you referencing?

14      Q.   Exhibit 2 to your deposition.  It's

15  dated December 2008.  The first letter that --

16  the only letter that I have, June of 2006,

17  that's over -- over two years and six months

18  when there's actually a formal agreement.  I'm

19  just curious as to why it took so long.

20      A.   Well, this Settlement Agreement only

21  has to do with the idea of whether crew status

22  changes ought to be imputed during a period of

23  military absence, and there was a difference of

24  opinion between the company and the Union as to

1    whether that ought to be done at all.

2         Q.   Okay.  So, it -- there was -- if I

3    understand you correctly, there were some

4    negotiation for about two years and six months

5    regarding this issue?

6         A.   I don't remember when the issue was

7    first raised, so I don't know if it was two

8    years and six months.  My recollection is that

9    it was raised, at least initially, in the

10   aftermath of the company deciding to change the

11   way it calculated B-Plan benefits when they

12   were on a short-term military leave, so that --

13   that -- all that event, I think, led some at

14   the Union to ask other questions, and my

15   recollection is that how we handle crew status

16   changes is one of the things that was raised at

17   the time, but we had a difference of opinion

18   with the Union as to what was the proper

19   treatment.

20        Q.   Okay.  And I believe you testified

21   earlier that -- and, again, this is going to

22   be, you know, fairly simple, based on my

23   understanding, but crew status changes for a

24   pilot have an increase in pay depending upon

1     really, about how mechanics get their work and

2     are assigned it.

3             Q.   Sure.  And, again --

4             A.   So, "I don't know" I think is the

5     answer.

6             Q.   Okay.  And I'm just -- I guess you've

7     answered my question.

8             A.   Okay.

9             Q.   And that is, short-term military

10    leaves can be found in regard to pilots in

11    Section 25?

12            A.   Yes, sir.

13                 MR. REED:  On the Collective

14            Bargaining Agreement, right?

15                 THE WITNESS:  Yes.

16    BY MR. NAPITONIA:

17            Q.   Let me ask you this in -- in -- in

18    general terms as it applies to the pilots.  I

19    believe you testified earlier that short-term

20    military leaves were not captured, correct?

21            A.   Well, they were not captured -- they

22    were not captured in the way that we ultimately

23    decided they ought to be captured.  They --

24    they would, for instance, be captured if -- if

1    you recall the discussion about the 42-credit

2    hour trip dropping into the makeup bank and

3    then being -- being flown back, they would be

4    captured in that instance, which happens very,

5    very often.   I mean, very often military

6    servicemen end up flying back hours that drop

7    into their makeup bank that got into their

8    makeup bank going to military service, so, in

9    all the cases where pilots flew back the hours

10   that dropped into the makeup bank --

11         Q.   Uh-huh (affirmative response).

12         A.   -- B-Plan contributions would have

13   been made on those.   The circumstance where

14   they would not have been made would be if they

15   didn't fly those hours back at all or if they

16   did fly them back and it was outside the 90-day

17   window, then the B-Plan contribution would not

18   have been made inside the 90-day window but

19   outside it.

20         Q.   Okay.   But never -- nevertheless, am

21   I correct that some short-term military leaves

22   were not properly calculated?

23              MR. REED:   Objection.   Asked and

24         answered.   He just answered that.

BY MR. NAPITONIA:

Q.   You can answer the question.

A.   We decided the better application
would be to make B-Plan contributions
regardless of whether the pilot ever flew that
back.

Q.   And that was after negotiations with
the Union, correct?

A.   Well, the B -- the B-Plan part on --
the original B-Plan part where the short-term
really wasn't a matter of negotiations, that
was a matter of us agreeing that there was an
issue and determining how we were going to
change it and then communicating with the
pilots' Union about it.  The -- the
negotiations with the Union happened with
regard to whether to impute crew status changes
during a longer period of military absence --

Q.   Okay.

A.   -- for the purpose of calculating
imputed earnings.

MR. NAPITONIA:  Let's go off the
record for a second.

THE VIDEOGRAPHER:  Going off the

1    that I know of in particular than maybe one --

2        Q.  Okay.

3        A.  -- one weekend or a period of four

4    days.

5        Q.  Okay.  All right.  Thank you.  I have

6    no further questions.

7        A.  Okay.

8        MR. REED:  I actually have a couple

9        just to clear up the record.

10                   CROSS-EXAMINATION

11   BY MR. REED:

12       Q.  Mr. Maxwell, do you remember your

13   testimony when you were talking about

14   discussions that you had with the Union about

15   whether or not military status impacts the

16   Traditional Pension Plan?

17       A.  Yes.

18       Q.  Okay.  Were those discussions about

19   crew status?

20       A.  They were about whether to impute a

21   crew status change during a period of long-term

22   military service.

23       Q.  Okay.  And so that was -- that was a

24   discussion you had with -- with the Union was

1   solely about crew status?

2        A.   The -- I think you said about the

3   negotiations which led to the Settlement

4   Agreement were about whether to impute a crew

5   status change.

6        Q.   And, for the record, I don't think

7   you described "crew status" earlier.  Can --

8   can you generally describe what that means?

9        A.   A crew status is a pilot's aircraft

10  and seat position, so, for example, Wide Body

11  First Officer is a crew status.  Actually,

12  MD-11 First Officer more technically is a crew

13  status, but for pay purposes, it only matters

14  that it's a Wide Body.

15       Q.   Okay.  So, unless you're a pilot with

16  FedEx, crew status doesn't have -- let me

17  rephrase that.  A non-pilot employee doesn't

18  have any crew status.  Is that accurate to say?

19       A.   "Crew status" is -- that's accurate.

20  "Crew status" is a defined term under the

21  Collective Bargaining Agreement with the

22  pilots.

23       Q.   And you -- very recently, you were

24  testifying about short-term military leave not

87

1    being captured for pilots.  Do you remember

2    that testimony?

3         A.   In some circumstances, that was true.

4         Q.   Right.  And, for the record so the

5    record will be clear, can you describe those

6    circumstances where short-term -- I -- I think

7    opposing counsel asked it to you like this,

8    like short-term military leave was not

9    captured.  Can you explain in what

10   circumstances you're talking about?  It wasn't

11   captured for pilots?

12        A.   It was not captured for pilots if

13   they had a trip or activity on their line that

14   conflicted with military leave.

15        Q.   You're talking about a flight?

16        A.   It could be a flight, it could be a

17   reserve trip, it could be a training event, so

18   any activity that generates credit hours, but

19   it would be specific to piloting.  I mean,

20   you're either flying an airplane as a pilot,

21   you're sitting on reserves as a pilot so that

22   you can fly an airplane if need be, or you're

23   in training.  Any of those things can be in

24   conflict with military leave and generate

```
 1    credit hours into your makeup bank, so the
 2    specific circumstance that I was talking about
 3    was one of those events conflicts with
 4    short-term military leave, drops into the
 5    makeup bank and then is not subsequently flown
 6    back, or is subsequently flown back outside the
 7    90-day window.
 8          Q.   But that issue doesn't have anything
 9    to do with non-pilot employees at FedEx, does
10    it, or do you know?
11              MR. NAPITONIA:   Object to the
12          question.
13              MR. REED:   Okay.
14          A.   No.
15          Q.   What are credit hours?
16          A.   Credit hours are -- credit hours are
17    the -- the measurement for units of work for
18    pilots, and there's a section for -- the
19    pilot's contract has 20-some-odd pages that
20    determine, that -- that describe how and in
21    what circumstances credit hours are credited to
22    pilots, so, if you fly a trip, there's a fairly
23    detailed formula that determines, on both the
24    schedule and an actual basis, how many credit
```

1  hours that trip is worth.  If you sit a reserve

2  day, there is a credit-hour value associated

3  with that R-Day.  If you -- if you perform a

4  training event, there's a credit-hour value

5  associated with that training event.  So, in

6  order to determine a pilot's pay, you multiply

7  credit hours times the hourly rate and that

8  yields a dollar figure.

9       Q.   Do non-pilot employees at FedEx have

10  credit hours?

11       A.   No.

12       Q.   What is a B-Plan?

13       A.   The B-Plan is a Defined Contribution

14  Plan.  Well, the B-Plan that we refer to as the

15  Defined Contribution Plan, that's more formally

16  known as the Pilots' Money Purchase Pension

17  Plan.

18       Q.   Right, but can you -- can you kind of

19  break down the contributions?  For example,

20  does -- does an employee have to make a

21  contribution?  I mean, can you just describe

22  the characteristics of the B-Plan for the

23  record?

24       A.   Sure.  For pilots, the B -- the B --

1    the B-Plan for pilots provides that whatever

2    their pensionable earnings are, the company

3    will make a contribution equal to seven percent

4    of those earnings into a Defined Contribution

5    Plan, which is located at Vanguard, and it's in

6    the pilot's name.  Those contributions are

7    limited by several different IRS limits, in

8    particular the 401(a)(17) and the 415 E-Limits.

9         Q.   Does an employee have to make a

10   contribution into the B-Plan?

11        A.   No.

12        Q.   So, it's not an -- it's not an

13   employer match, is it?

14        A.   No.

15        Q.   Do non-pilot employees have a B-Plan?

16        A.   No.

17        Q.   Have they ever had a B-Plan?

18        A.   No.

19        MR. REED:  No further questions.

20        MR. NAPITONIA:  Nothing further, sir.

21   Thank you.

22        THE WITNESS:  Thank you.

23        THE VIDEOGRAPHER:  This concludes the

24   videotaped deposition.  The time is 1:48.

92

```
 1                    C E R T I F I C A T E

 2

 3     STATE OF TENNESSEE:

 4     COUNTY OF MADISON:

 5
              I, TAMMY W. WENDEL, LCR, and Notary
 6     Public, Madison County, Tennessee, CERTIFY:

 7              The foregoing proceedings were taken
       before me at the time and place stated in the
 8     foregoing styled cause with the appearances as
       noted.
 9
                Being a Court Reporter, I then
10     reported the proceeding in Stenotype, and the
       foregoing pages contain a true and correct
11     transcript of my said Stenotype notes then and
       there taken.
12
                I am not in the employ of and am not
13     related to any of the parties or their counsel,
       and I have no interest in the matter involved.
14
                I further certify that in order for
15     this document to be considered a true and
       correct copy, it must bear my original
16     signature and that any reproduction in whole or
       in part of this document is not authorized and
17     not to be considered authentic.  Unauthorized
       reproduction and/or transfer will be in
18     violation of Tennessee Code Annotated
       39-14-149, Theft of Services.
19
                Witness my signature this the _____
20     day of _____, 2015.

21
                     _____
22                   TAMMY W. WENDEL, LCR

23     Notary Public at Large
       For the State of Tennessee
       My Commission Expires:
24     February 24, 2016
```